RECEIVED

NOV – 4 2011

TERESA L. DEPPNER, CLERK
U.S. District Court
Southern District of West Virginia

IN THE SOUTHERN DISTRICT COURT OF WEST VIRGINIA
AT CHARLESTON

**ERNEST ALDERMAN,**

**Plaintiff,**

v.

**CIVIL ACTION NO. 2:10-CV-00907**
*Lead Case*
**Judge Goodwin**

**FOLA COAL COMPANT, LLC, a
West Virginia corporation; and
CONSOL ENERGY, INC., a
Delaware corporation,**

**Defendants.**

## MEMORANDUM IN SUPPPORT OF PLAINTIFFS' MOTION TO FILE MODIFICATION TO PREVIOUSLY FILED OBJECTIONS TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiffs believe that after the depositions taken of John Goroncy and Chase Elswick, both being persons who participated in the reduction in force and were the persons primarily responsible for the preparation of the list of the persons to be a part of the said reduction in force.

The deposition of John Goroncy revealed that he was the person that made the final decision as to the reduction in force before the names were submitted to the main office for consideration and approval.  (See Goroncy Deposition testimony attached hereto as **Exhibit "A", Line-27**)

Mr. Goroncy testified that he compiled a first lists for review and this list of names for discharge did not involve any person that was discharged for having a bad attitude.  Therefore, Plaintiffs  Ronnie Arnold, Billy Joe Querrey and Thomas Vance was not on the first list compiled by Mr. Goroncy.  In addition, Mr. Goroncy testified that

there was a certain class of employees, that being listed under the category of "Less Service Kept For Skills" were not a part of the reduction in force no matter how much or how little employment time was a part of the history of that persons employment with the defendant.  (See Goroncy Deposition testimony attached hereto as **Exhibit "B", Line 20**)(See Fola Fed 000900 provided in Discovery attached hereto as **Exhibit "C"**)

### RONNIE ARNOLD DID NOT HAVE A BAD ATTITUDE.

The testimony of John Goroncy regarding the attitude of Ronnie Arnold is in total conflict with the affidavit of James "Jamie" Taylor, the immediate supervisor of Mr. Arnold.  The affidavit of James Taylor should be considered by the Court because Rule 56 of the Federal Rules of Civil Procedure, more particularily Rule 56©(B)(4), Mr. Taylor had personal knowledge of the facts in the affidavit, he set out facts that would be admissible into evidence at trial and he is certainly competent to testify at trial. Mr. Goroncy, during his deposition could not produce any written documentation regarding the alleged "bad attitude" of Mr. Arnold.  Indeed, the deposition and exhibits attached thereto indicated that Mr. Arnold was one of the few employees that contacted the elected representatives regarding the continuation of coal operations at the Fola Coal locations after the decision in court that placed the operation at Fola Coal in question as to  whether it could receive additional permits or not. (See Goroncy Deposition testimony attached hereto as **Exhibit "D", Line 12**)

Mr. Arnold was also the person designated by Fola Coal to deliver materials to the local business community in the area regarding public relations between the business persons and Fola Coal. It is further undisputed that Mr. Arnold worked all the hours he could possible work, even on holidays and during hunting season so that other employees

of Fola Coal could participate in hunting season and be home with the families during the holidays. During the approximate 16 years of employment, Mr. Arnold missed approximately five (5) days due to illness and/or family leave.  During the deposition of Chase Elswick it was learned that he had taken family leave during his first years of employment and by just mathematical his percentage of employment versus family leave is greater that Mr. Arnolds.  Obviously, Mr. Arnold has a better superior attitude toward his job that Mr. Elswick and in the Defendant's Motion for Summary Judgment (page 5) it is stated that "Fola believes that when layoffs are necessary, those employees who demonstrate superior attitude towards their job should be retained over those with a poor attitude". None of the criteria stated in the first full paragraph on page 5 referenced above apply to Mr. Arnold.

Certainly any question regarding attitude is a jury question and a issue in controversy.

### BILLY JOE QUERREY DID NOT HAVE A BAD ATTITUDE

Billy Joe Querrey had been working at the Fola site since it began operation and that was for more than  16 years. In the deposition of Mr. Goroncy, he testified that he did not even know who Billy Joe Querrey was and had not had any difficulty with Billy Joe Querrey.  There were no discipline measures against Mr. Querrey and they were no complaints as to the manner in which Mr. Querrey performed his duties for which he was hired.  There is nothing produced in writing regarding the attitude of Mr. Querrey that is a part of his personnel file, his employment history or any other records kept by the Defendant.  Mr. Querrey was in the to three (3) as to his employment classification and as a the only reason for Mr. Querrey to be discharged was his age.

Certainly any question regarding attitude is a jury question and a issue in controversy.

**THOMAS VANCE DID NOT HAVE A BAD ATTITUDE**

There is nothing in the record to indicate that Thomas Vance had a bad attitude. In addition, Mr. Vance was a skilled welder and was employed as such at the time of the reduction in force. I addition, Mr. Vance has been employed in the coal industry in many catagories, some of which are plant operator, highwall miner worker, mechanic and other related duties in the coal mine industry and Mr. Vance certainly fell into the category described by Mr. Goroncy as persons with "Less Service Kept For Skills" and persons in that category were exempt being a part of the reduction in force that is basis for this action. Mr. Vance had no disciplinary problems, no performance problems, and had special skills that should have exempted him from being a part of the reduction in force. However, Mr. Vance for some reason was discharged and is an issue in controversy..

Again, certainly any question regarding attitude is a jury question and a issue in controversy.

**JOE FITZWATER WAS NOT A POOR PERFORMER ON THE JOB AND HAD SKILLS THAT EXEMPTED HIM FROM DISCHARGE**

During the deposition of Mr. Goroncy, it was determined that Joe Fitzwater was discharged because of poor performance. This poor performance is founded upon the fact that Mr. Fitzwater was involved in two (2) incidents categorized as Unsafe Acts. Mr. Fitzwater, during his deposition explained his actions and the reasons why he was not a fault for the accident of 1-29-09 and that the incident of 12-13-08 did not result in any injury or loss work time and that he followed proper company policy regarding the 12-

13-08 incident.  The other person involved in the 1-29-09 incident was not a part of the

persons identified as RIF based on performance and the person responsible for the

accident of 1-29-09 was not a part of the reduction in force.  These actions were in direct

conflict with the deposition testimony of Mr. Goroncy who stated that anyone that was a

part of any incident resulting in injury or damaged equipment was placed first on the list

for persons to be a part of the reduction in force of February, 2010. (See Goroncy

Deposition testimony attached hereto as (**Exhibit "E" Line 25**) (See Fitzwater

Deposition testimony attached hereto as (**Exhibit "F"**)

In addition, a review of Exhibit 1 to the deposition of Joe Fitzwater, (attached

hereto as **Exhibit "G"**) indicates that Joe Fitzwater is skilled in the areas of Dozer

Operator, 16G Grader Operator, 14G Grader Operator, 988F Loader Operator, and Auger

Operator and Joe Fitzwater was not listed on the persons retained by the defendant that

were categorized as Less Service Kept For Skills. (**See Exhibit "C"**)

### DEAN TAYLOR AND GLEN DEBOARD  HAD SPECIAL SKILLS AND SHOULD HAVE BEEN EXEMPT FROM DISCHARGE

As stated before, the deposition testimony of John Goroncy revealed that there

was a certain class of employees exempt from being a part of the reduction in force of

February, 2010. (See **Exhibits "B" and "C"** attached hereto)  The deposition of Dean

Taylor revealed in Exhibit 1 attached to his Deposition (attached hereto as **Exhibit "H"**),

indicates that he possesses special skills, those being (a) a Certified Surface Miner-07; (b)

Preparation Plant Piston Operator; (c) Plant Maintance; (d) Welding and Cutting Torch

experience; (e) Heavy Equipment Operator {Triple 7-B Volvo Truck and Triaxle, D6 and

D8 Dozer, 88 and 92 Loader}all of which should qualify for inclusion of the persons with

D8 Dozer, 88 and 92 Loader}all of which should qualify for inclusion of the persons with special skills listed on Fola Fed 000900, attached hereto as **Exhibit "C"** and therefor exempt from being a part of the reduction in force.

Likewise with Glen Jay DeBoard there is listed on his Deposition Exhibit 4, (attached hereto as **Exhibit "I"**) that he possessed special skills including but not limited to being a welder, a dozer operator, a loader operator, a truck driver and an electric motor repairman, all of which are needed in the coal industry business as represented by Fola Coal.  These special skills should have exempted Glen Jay DeBoard from being a part of the reduction in force of February, 2010.

### THOMAS WILLIAMS WHOULD NOT HAVE BEEN A PART OF THE REDUCTION IN FORCE OF FEBRUARY, 2010.

Thomas Williams was  part of the reduction in force of February, 2010, because of the number of years of employment.  Mr. Williams, like all other plaintiffs, had been a loyal employee to Fola and had performed many duties and there was never a complaint regarding his method of performance, quality of work, attitude and other employees with less years experience were retained under the guise of "special skills" and it can only be concluded that Mr. Williams was let go only because of his age and the fact that his benefits would vest in the near future.

As shown above, all of the Plaintiffs have significant, material and genuine issues in controversy after the information learned from the deposition of Chase Elswick and John Goroncy.

It is well-settled law in the United States that the moving party must prove his right to summary judgment with such clarity that the nonmoving party cannot recover under any discernible circumstances. *Williams v. Taylor*, 677 F.2d 510 C.A.5 (Miss.

1982). Further, the party moving for summary judgment has the burden to show initially absence of genuine issue concerning any material fact. *United Mine Workers of America, Dist. 31 v. Thames Development, Ltd.*, 821 F.Supp. 426 (S.D. W. Va.1993).

"The purpose of summary judgment is to isolate and dispose of meritless litigation." *Silling v. Erwin*, 881 F.Supp. 236 (S.D. W. Va. 1995). Further, "summary judgment procedure cannot be a substitute for the trial of disputed issues of fact inasmuch as its purpose is to determine whether there are issues properly to be tried." *Id.*

Plaintiffs do not deny that the moving party is not the only one with a burden. Although this Court is required to view all underlying facts and inferences in light most favorable to the nonmoving party on motion for summary judgment, the "nonmoving party nonetheless must offer some concrete evidence from which a reasonable juror could return a verdict in his or her favor." *Collard v. Smith Newspapers, Inc.*, 915 F.Supp. 805 (S.D. W. Va. 1996). However, the "party moving for summary judgment has the initial burden of showing absence of genuine issue concerning any material fact and, if [the] moving party meets its initial burden, [the] burden then shifts to nonmoving party to establish existence of element essential to that party's case and on which that party will bear the burden of proof at trial." *Allstate Ins. Co. v. Ashley*, 833 F.Supp. 583 (S.D. W. Va. 1993), affirmed 37 F.3d 1492. (Emphasis added).

Accordingly, the Court should consider the Defendant's Motion for Summary Judgment in a light most favorable to Plaintiffs. In this case, it is reasonable to conclude that a jury could return a verdict in favor of Plaintiffs under the facts set forth in the Complaint. Further, there are genuine issues of material fact in this matter. Thus, the Defendant's motion should be denied.

**ERNEST ALDERMAN** *(LEAD CASE)*

**BY COUNSEL**

**Wayne King, WVSBN 2045**
**420 Main Street**
**P. O. Box 356**
**Clay, West Virginia 25043**
**Phone-1—304-880-8886**
**e-mail-wayne.lawyer@gmail.com and waynekinglawyer@yahoo.com**

## IN THE SOUTHERN DISTRICT COURT OF WEST VIRGINIA
## AT CHARLESTON

**ERNEST ALDERMAN,**

      **Plaintiff,**

**v.**                         **CIVIL ACTION NO. 2:10-CV-00907**
                                               **Judge Goodwin**

**FOLA COAL COMPANT, LLC, a**
**West Virginia corporation; and**
**CONSOL ENERGY, INC., a**
**Delaware corporation,**

      **Defendants.**

### <u>CERTIFICATE OF SERVICE</u>

      I, Wayne King, Counsel for the Plaintiff hereby certify that I have this the 4th

day of November, 2011, personally served a true copy of **PLAINTIFFS' MOTION**

**TO FILE MODIFICATION TO PREVIOUSLY FILED OBJECTIONS TO**

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT and MEMORANDUM**

**IN SUPPPORT OF PLAINTIFFS' MOTION TO FILE MODIFICATION TO**

**PREVIOUSLY FILED OBJECTRIONS TO DEFENDANT'S MOTION FOR**

**SUMMARY JUDGMENT(with attachments)** on Defendants by hand delivering the

same to the Counsel for the Defendants at their office in the law offices of Steptoe &

Johnson, PLLC, Attorneys at Law, Chase Tower, Eighth Floor, Charleston, W. Va.

_____
**Wayne King, WVSBN 2045**
**420 Main Street**
**P. O. Box 356**
**Clay, West Virginia 26043**
**Phone-1-304-880-8886**
**E-Mail-wayne.lawyer@gmail.com**
**Counsel for Ronnie Arnold**

## IN THE SOUTHERN DISTRICT COURT OF WEST VIRGINIA
## AT CHARLESTON

**ERNEST ALDERMAN,**

        **Plaintiff,**

    **v.**                            **CIVIL ACTION NO. 2:10-CV-00907**
                                                     *Lead Case*
                                               **Judge Goodwin**

**FOLA COAL COMPANT, LLC, a**
**West Virginia corporation; and**
**CONSOL ENERGY, INC., a**
**Delaware corporation,**

        **Defendants.**

# EXHIBIT

# "A"



IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

AT CHARLESTON

ERNEST ALDERMAN,

      Plaintiff,

v.    CIVIL ACTION NO. 2:10-CV-00907

FOLA COAL COMPANY, L.L.C. a

West Virginia corporation; and

CONSOL ENERGY, INC., a Delaware

corporation,

      Defendants.

The deposition of JOHN ANTHONY GORONCY, III, was taken pursuant to notice, in the above-entitled action, on the 18th day of October, 2011, commencing at 1:30 p.m. and concluding at 4:15 p.m., at the Circuit Court of Clay County, Main Street, Clay County, Clay, West Virginia, before Pamela I. Wood, Certified Court Reporter and Notary Public, pursuant to the Federal Rules of Procedure.

*DeMuth Court Reporting, L.L.C.*

*PAMELA I. WOOD, CCR*

*Post Office Box 701*

*Dunbar, West Virginia 25064*

*304-766-8708*

**APPEARANCES**

**On behalf of the Plaintiff:**

WAYNE KING, ESQUIRE

426 Main Street

Clay, West Virginia 25043

**On Behalf of the Defendants:**

JOSEPH U. LEONORO, ESQUIRE

Steptoe & Johnson

Chase Tower, Eighth Floor

Post Office Box 1588

Charleston, West Virginia 25326-1588

**INDEX**

| Witness | Examination |
|---|---|
| JOHN ANTHONY GORONCY, III | 4 (King) |
| | 95 (Leonoro) |

**Exhibits:**        **Page:**

have not seen a document where these notes were put on before.

Q. You've seen a list that had the printed portion of it on it?

A. Yes, I did.

Q. All right.  This is Fola Fed bates documents 000889 through 000896.  I'd like for you to look through those and see if any of those are your notations.

A. (Witness reviews documents.)  No, they are not my notations.

Q. Do you know whose they are?

A. No, I don't know.

Q. I'll hand you four bates, Fed 0086880 through 88800888.  There's not many, but I'm just wondering if you recognize any of those changes on those documents.

A. (Witness reviews documents.)  No, I don't recognize any of these markings on the documents.

Q. I'm going to hand you Fola Fed 000761 through 769.  No, I'm sorry, 770.

A. (Witness reviews documents.)  I don't recognize any of the handwriting on these, either.

Q. I want to discuss the February 2010 layoff with you.  And, of course, what procedure was followed in determining who would be affected that was presently employed at Fola Coal in February 2010 and lost their position as a result of that layoff?

A. We went by the language in the employee handbook.

Q. And when you say "we," could you please identify we?

A. It was Gerald Kowzan, Chase Elswick, myself, and eventually Doug Martin was involved in it.

L-27 ← Q. Now, of those four who had the final say?

A. I did.

Q. Okay.

A. Could I clarify that?

Q. You can.

A. I had the final recommendation before it was forwarded up to corporate for final review.

Q. Right.  Thank you for clearing that up.  I should have made my question more clear.  There's always someone up the chain maybe until we get to the top dog; right?

A. Yes.

Q. You're not the owner of Consol Coal, are you?

A. That's exactly right.

Q. Okay.  So you made certain recommendations and sent it on up the chain of command.  Do you know whether or not your recommendations were accepted in full, rejected in full, or modified in any way?

A. I don't recall any modifications to them.  I'm going to generally state that they were accepted in full.

Q. Okay.  Were these documents that I showed you before with the interlineations on them, the notes and everything else.  Had you ever seen any of those documents with those notations prior to making your final decision?

A. I seen some of the documents, but --

Q. I mean, wouldn't the notations --

A -- but not the notes on it, no, I didn't.

Q. Okay.  So the documents with the notations you had not seen, but the printed portions of the documents you had seen.  That would be fair to say?

A. That's correct.

Q. Now, I'm going to hand you what's commonly been referred to, and this is Fola Fed 0073 through 0132, and this is what the Fola Coal Company employee handbook.  I'm not going to have this made as an exhibit to this deposition.  We've got enough of them already.  I just want to ask you a few questions about that.

A. Okay.

IN THE SOUTHERN DISTRICT COURT OF WEST VIRGINIA
AT CHARLESTON

**ERNEST ALDERMAN,**

        **Plaintiff,**

**v.**                                       **CIVIL ACTION NO. 2:10-CV-00907**
                                                      *Lead Case*
                                                 **Judge Goodwin**

**FOLA COAL COMPANT, LLC, a**
**West Virginia corporation; and**
**CONSOL ENERGY, INC., a**
**Delaware corporation,**

        **Defendants.**

# EXHIBIT

# "B"

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

AT CHARLESTON

ERNEST ALDERMAN,

      Plaintiff,

v.     CIVIL ACTION NO. 2:10-CV-00907

FOLA COAL COMPANY, L.L.C. a

West Virginia corporation; and

CONSOL ENERGY, INC., a Delaware

corporation,

      Defendants.

    The deposition of JOHN ANTHONY GORONCY, III, was taken pursuant to notice, in the above-entitled action, on the 18th day of October, 2011, commencing at 1:30 p.m. and concluding at 4:15 p.m., at the Circuit Court of Clay County, Main Street, Clay County, Clay, West Virginia, before Pamela I. Wood, Certified Court Reporter and Notary Public, pursuant to the Federal Rules of Procedure.

*DeMuth Court Reporting, L.L.C.*

*PAMELA I. WOOD, CCR*

*Post Office Box 701*

MR. LEONORO:   Objection to the form of the question.

A. I don't know a reason why he wouldn't sign it, why the employee wouldn't sign it.  It could be numerous reasons.

Q. Less service kept for skills, that's on my third page.  I don't know what page it is on yours, because you have the last documentation.  Okay?

A. Okay.

Q. On mine I have eight names.  On your documentation, how many names do you have?  Is it greater than eight?

A. Yes, it's greater than eight.

Q. Where is less service for skills indicated in the Fola employee handbook?

A. I would list it under the "consideration shall be given company wide as to which area shall be affected in reduction in force."

Q. See, I will agree with you that under discipline it came under the subcategory RIF, based on performance.  I'll accept that for today, okay, just for your testimony.  I may not agree with it, but I'll accept your answer.

A. Okay.

Line 20 → Q. I'm just wondering where less service kept for skills comes under the guidelines for layoffs and recalls?

A. What this was, these people had specialized skills.  They were either mechanics or highwall miner individuals, where a lot of the surface guys cannot run the highwall miner, do not work around it. And if you'll look at the mobile equipment that all these people were put into the highwall miner, with the exception of David Potasnik, and either they are mechanics or they had specialized skills and that's why they were retained.

Q. These aren't the ones that are going to be retained.  These are the ones that are being moved, this is the ones that are being RIF, is it not?

A. No, these are the people that were retained for less skills. I mean, with more skills, less time, less service, kept for skills.

Q. This is a RIF based on performance?

A. Right.

Q. We're still under the reduction in force list. And then we come to the next category, remained to RIF based on service. That led me to believe that these people were RIF for less service, kept for skills. Can you explain that to me? And in addition to that, we have RIF based on attitude and RIF based on ability, but then we have less service kept for skills.

These people were kept and not a part of the reduction in force. Is that what you're telling me?

A. Yes, sir.

Q. Okay. All right. So the names listed on Fola Fed 000900 were not a part of the February reduction in force?

A. They were not part of the February 2010 reduction. That's correct.

Q. And on Mr. Kowzan's statement, he talks Ronnie Arnold pursuant to attitude, Billy Joe Querrey attitude, and Thomas Vance was attitude.

Those three particular names, maybe I'm missing them. I want to hand you the documents Fola Fed 845 through 853. And are those three names a part of that?

A. This is the first list. I don't believe any of the three names that you mentioned were listed on here.

Q. Okay. That's Ronald Arnold, Thomas Vance and Billy Joe Querrey.

A. I don't believe they're on here, no.

Q. Now, let's go to attitude. Did you ever have any personal dealings with Billy Joe Querrey regarding his job performance?

A. His attitude?

Q. Well, I'm just going by job performance, generally job performance.

A. No, I didn't.

Q. You never had any contact. Did you ever have any questions about his qualification to do what he was employed to do?

IN THE SOUTHERN DISTRICT COURT OF WEST VIRGINIA
AT CHARLESTON

ERNEST ALDERMAN,

          Plaintiff,

v.                                                    CIVIL ACTION NO. 2:10-CV-00907
                                                      *Lead Case*
                                                      Judge Goodwin

FOLA COAL COMPANT, LLC, a
West Virginia corporation; and
CONSOL ENERGY, INC., a
Delaware corporation,

          Defendants.

# EXHIBIT

# "C"

FOLA FED 000900

Less service kept for skills

| | | | |
|---|---|---|---|
| BAKER MICHAEL | ELECTRICIAN/MECHANIC(HW) - AMV | Fola Coal Company, LLC | 12/17/2001 |
| BAKER GARY | MOBILE EQUIP OPR(SURF) - AMV I | Powellton Coal Company | 12/17/2001 |
| DUFFIELD BILLY | SCALEHOUSE OPR(STP) - AMV II | Fola Coal Company, LLC | 12/26/2001 |
| BROWN THOMAS | MOBILE EQUIP OPR(SURF) - AMV I | Powellton Coal Company | 01/07/2002 |
| LEGG DONALD | MOBILE EQUIP OPR(PPFC) - AMV I | Fola Coal Company, LLC | 01/21/2002 |
| VALENTINE ROBERT | MECHANIC(STP) - AMVXI | Fola Coal Company, LLC | 02/08/2002 |
| HAMRICK MARK | MOBILE EQUIP OPR(STP) - AMV II | Fola Coal Company, LLC | 02/14/2002 |
| HANNA PATRICK | MOBILE EQUIP OPR(STP) - AMV II | Fola Coal Company, LLC | 02/18/2002 |
| BROWN JENNINGS | MOBILE EQUIP OPR(SURF) - AMV I | Powellton Coal Company | 07/08/2002 |
| HORROCKS MICHAEL | MOBILE EQUIP OPR(SURF) - AMV I | Powellton Coal Company | 07/11/2002 |
| POTASNIK DAVID | MOBILE EQUIP OPR(STP) - AMV II | Fola Coal Company, LLC | 08/05/2002 |
| NEFF JOSHUA | MOBILE EQUIP OPR(STP) - AMV II | Fola Coal Company, LLC | 08/05/2002 |
| OSBORNE TEDDY | MOBILE EQUIP OPR(STP) - AMV II | Fola Coal Company, LLC | 08/05/2002 |
| MURPHY MARSHALL | MECHANIC(STP) - AMVXI | Fola Coal Company, LLC | 08/07/2002 |
| HORROCKS TOMMY | GREASER/FUELER(STP) - AMV II | Fola Coal Company, LLC | 09/10/2002 |
| STOVER STEPHEN | ELEC/MECH CREW LEADER(HW) - AMV | Fola Coal Company, LLC | 02/10/2003 |
| | - promoted to salary | | |
| LIGHT DANIEL | ELECTRICIAN(PP) - AMV | Fola Coal Company, LLC | 02/10/2003 |
| | - transferred to Little Eagle, qualified underground | | |
| SAMUELS WILLIAM | MECH/ELEC CREW LEADER(STP) - AMV | Fola Coal Company, LLC | 08/02/2004 |
| FOSTER ROBERT | MINER OPR(HW) - AMV I | Fola Coal Company, LLC | 10/11/2004 |
| | - transferred to Little Eagle, qualified underground | | |
| SHULER DANIEL | MECHANIC CREW LEADER(STP) - AMV | Fola Coal Company, LLC | 02/14/2005 |
| ASBURY BRADLEY- | MOBILE EQUIP OPR(STP) - AMV II | Fola Coal Company, LLC | 08/16/2006 |
| ROSS DONALD | MECHANIC(STP) - AMV XI | Fola Coal Company, LLC | 06/11/2008 |
| DUNLAP EARL | MECHANIC(STP) - AMV XI | Fola Coal Company, LLC | 08/04/2008 |

CONFIDENTIAL

IN THE SOUTHERN DISTRICT COURT OF WEST VIRGINIA
AT CHARLESTON

ERNEST ALDERMAN,

        Plaintiff,

v.

FOLA COAL COMPANT, LLC, a
West Virginia corporation; and
CONSOL ENERGY, INC., a
Delaware corporation,

        Defendants.

CIVIL ACTION NO. 2:10-CV-00907
*Lead Case*
Judge Goodwin

# EXHIBIT

# "D"

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

AT CHARLESTON

ERNEST ALDERMAN,

      Plaintiff,

v.    CIVIL ACTION NO. 2:10-CV-00907

FOLA COAL COMPANY, L.L.C. a

West Virginia corporation; and

CONSOL ENERGY, INC., a Delaware

corporation,

      Defendants.

    The deposition of JOHN ANTHONY GORONCY, III, was taken pursuant to notice, in the above-entitled action, on the 18th day of October, 2011, commencing at 1:30 p.m. and concluding at 4:15 p.m., at the Circuit Court of Clay County, Main Street, Clay County, Clay, West Virginia, before Pamela I. Wood, Certified Court Reporter and Notary Public, pursuant to the Federal Rules of Procedure.

*DeMuth Court Reporting, L.L.C.*

*PAMELA I. WOOD, CCR*

*Post Office Box 701*

A. He made the initial recommendations and then I made the final decision on it.

Q. Okay.

A. Let me clarify one more thing. I made the final recommendation pending the decision for corporate.

Q. And I always understand that.

A. Okay.

Q. Okay. You were certainly aware at the time of the reduction in force that there were prior court decisions and prior governmental decisions that may have affected Fola's ability to mine coal.

A. That's correct. The Judge Chambers decisions.

Q. Okay. Now, as a result of that, did you request your employers to contact their legislators?

A. Sure.

Q. Okay.

A. Yes, we did.

Q. Now, if an employee contacted their legislator, would that be something that you would deem would show a good attitude toward a person's job?

A. No. The attitude I would refer to is the attitude they exhibit on the job when they're given work orders, when they're working with their peers, not writing a letter to their congressman.

Q. Okay. All right. During this period of time did you personally write to any legislators or congressmen expressing the desire of Fola Coal employees to want to work?

A. Yes, I did.

Q. Did you compose those letters yourself?

A. Well, I did my own personal letter, yes.

Q. Okay. Did any other employees perform letters?

A. They told me they did.  I didn't specifically say they did.

Q. Okay.  All right.  I'm going to hand you, and I have these marked collectively as deposition exhibit number 2.

    (WHEREUPON, Exhibit No. 2 was marked

    And is attached hereto.)

  MR. KING:  This will be three.

    (WHEREUPON, Exhibit No. 3 was marked

    And is attached hereto.)

A. Okay.  It's a letter to Governor Manchin, Senator Byrd, Representative Capito, Congressman Rayhall, Senator Rockefeller.

Q. This would have been our leaders that should have been contacted regarding Fola's operations.  Would that be fair to say?

A. That's correct.

Q. Okay.  Which employee did those letters?

A. It says it's Ronnie Arnold.

Q. Do you have any reason to dispute that he did those?

A. No, I don't.

Q. Do you still have a copy of the letters that you sent to the congressmen and the various representatives?

A. I don't know.  I did a lot of mine on email, sent a lot of them via email.

Q. And can you check to see if those emails or if any of your letters are still available; and if so, could you give them to your counsel to produce to us if they've not been produced to us?

A. I can look and see, but I don't know if they would be on email or not.  I don't know.

Q. Okay.  You'll check for us?

A. I'll check.

Q. Okay. This one indicates that -- I would think that this would indicate that Mr. Arnold certainly had a concern about his job and had a good attitude about his job, because he wanted to keep his job.

MR. LEONORO: Objection to the form of the question.

Q. And he wanted other people to keep jobs.

A. Well, everybody wanted to keep their jobs. We encourage our employees to write to their congressman. In fact, we even gave them some bullet points that this is the kind of things to cover with it. Didn't write the letters for them.

Q. I will hand you what's been marked as Number 3 and that's a form letter that was prepared by Mr. Arnold's wife, an English teacher at Clay High School. And do you know if that was given to the management of Fola Coal or even to yourself to distribute to the employees as an example?

A. No, I'm not aware of that.

Q. You're not aware of that?

A. No, I'm not aware of this letter.

Q. Well, does that show that if, in fact that was in the materials that were provided through discovery, that that was made available to the Fola Coal operation for use, that would demonstrate a positive attitude toward someone's job?

A. It would explain a positive reinforcement for the whole operation.

Q. And by doing that, you want to keep your job, Mr. Arnold would keep his job and everybody else; right?

A. Please rephrase.

Q. He certainly didn't write these letters knowing he was going to be reduced in force. He wrote them in anticipation of trying to keep the operation going?

A. That's what I would take it. He wrote it in anticipation in keeping the operation going, keep things moving forward and keep the operation whole.

Q. And that would seem like what I would define as a good employee.

A. Not necessarily.

Q. Okay.

   MR. LEONORO:  I object to the last question.

Q. And were you aware that Mr. Arnold and his wife even had an email network formed for people to send emails to local representatives and everything?

A. No, I wasn't aware of that.

Q. Would that indicate a positive attitude towards someone's job?

A. To the success of the operation it would, yes, not particularly for one's job.

Q. Okay.  Why would somebody want to see an operation be successful if you're not going to be a part of it?

A. I don't know that.  I don't know what's in Mr. Arnold's logic at that time.

Q. If you knew that you were going to be fired by Consol Coal tomorrow, would you write a letter on behalf of Consol Coal today praising them and asking for their help?

A. I thought the letters were thanking the congressmen and the senators for doing their work.

Q. Well, they were asking for their help.  Would you write to someone asking someone to help Consol Coal if you knew you were going to be fired tomorrow?

A. May or may not.  I don't know.

Q. Okay.  Now, there may be testimony I think during Mr. Arnold's deposition, that he was asked on numerous occasions, I won't say numerous, but on several occasions to deliver articles to the business people in the community, like jackets and things like this.

   Would you give that responsibility to an employee that had a bad attitude toward his job?

A. I don't know.

Q. Okay.  Now, let's go to Glen DeBoard.  You said he was laid off pursuant to length of service criteria.

# IN THE SOUTHERN DISTRICT COURT OF WEST VIRGINIA
## AT CHARLESTON

**ERNEST ALDERMAN,**

        **Plaintiff,**

    **v.**                              **CIVIL ACTION NO. 2:10-CV-00907**
                                                    *Lead Case*
                                              **Judge Goodwin**

**FOLA COAL COMPANT, LLC, a**
**West Virginia corporation; and**
**CONSOL ENERGY, INC., a**
**Delaware corporation,**

        **Defendants.**

# EXHIBIT

# "E"

as far as having to quote that list with no names, that was the positions that were available.

Q. Okay.  Where is that reflected in the Fola Coal Company employee manual that's the way to make reductions in force?

A. Well, the employee manual talks about in the case of reduction in force who stays and who doesn't stay, how it was determined.  The list that I'm talking about is not in there.  That was my list as far as the management of the operation goes.

Q. Okay.  So that was your personal list and your personal business list for employees.

A. No, I won't say it's personal, because there weren't any names on it.  It wasn't personal.  That was my list of employees needed to run the operation under the new scenario.

Q. And at one time it contained no names whatsoever.

A. That's correct.

Q. Okay.  Now, here's my question.  Did you fill in the list of people to retain and then whoever was left was the reduction in force, or did you determine the reduction in force first and that left a list of names?

A. No.  The way it was done, we had the list of positions.  Okay?  First, before we did anything at all, we moved out -- we disregarded the ones that had, quote, "performance problems."  Those are the ones that are listed here, RIF by performance.

Q. Okay.  All right.

A. So then with that being said, we started down a list of employees, of remaining employees that weren't on the discipline list or weren't on the performance list.  And we started putting them in the positions, tried to keep them in the current positions that they were currently doing and went down through the list until we went all the way to the bottom of it.  And then we had a list that was left of people RIF by length of service.

Q. Okay.  Let's go through some specific names.  Ernest Alderman was laid of pursuant to a performance criterion and then I see this RIF in performance, and it's also, I believe, on the second list, is it not?

A. Okay.  Yeah, he's right here.

## IN THE SOUTHERN DISTRICT COURT OF WEST VIRGINIA
## AT CHARLESTON

**ERNEST ALDERMAN,**

          **Plaintiff,**

     **v.**                           **CIVIL ACTION NO. 2:10-CV-00907**
                                              *Lead Case*
                                     **Judge Goodwin**

**FOLA COAL COMPANT, LLC, a
West Virginia corporation; and
CONSOL ENERGY, INC., a
Delaware corporation,**

          **Defendants.**

# EXHIBIT

# "F"

Ernest Alderman vs. Fola Coal Company LLC, et al.
*Deposition of Joseph Edward Fitzwater*
April 22, 2011

SHEET 1   PAGE 1

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
### At Charleston

**ERNEST ALDERMAN,**

      **Plaintiff,**

v.            **Civil Action No.:2:10-cv-00907**
                      **Lead Case 1**
                      **Judge Goodwin**

**FOLA COAL COMPANY, LLC, a
West Virginia corporation; and
CONSOL ENERGY, INC., a
Delaware corporation,**

      **Defendants.**

---

### VIDEO DEPOSITION OF JOSEPH EDWARD FITZWATER

---

**APRIL 22, 2011
1:30 P.M.**

---

**STEPTOE & JOHNSON, PLLC
707 VIRGINIA STREET, EAST
CHASE TOWER, 8TH FLOOR
CHARLESTON, WEST VIRGINIA**

---

**Nancy S. Jarrell
Certified Court Reporter**

Ernest Alderman vs. Fola Coal Company LLC, et al.
*Deposition of Joseph Edward Fitzwater*
April 22, 2011

SHEET 30   PAGE 114

**114**

1       A   That's right.
2       Q   Do you recall any of those specific
3 discussions during those safety meetings?
4       A   Just one when we had a loader accident,
5 and they discussed that the company should have had
6 the roads in better condition and what we'd do to
7 prevent it from then on.
8       Q   When was that loader accident?
9       A   It was in the winter of, I'd say, '08.
10      Q   Who was involved in that accident?
11      A   I was and Terry Messinger was.
12      Q   And you say "loader," what -- what do
13 you mean a loader?
14      A   Well, they're coal loaders -- I mean,
15 the end loaders.
16      Q   You're not talking about a truck, right?
17      A   No, loaders.
18      Q   Okay.
19      A   Two loaders.
20      Q   Like a -- like a bulldozer-type device?
21      A   No, (unintelligible).  No, it was the
22 end loaders.
23      Q   Okay.
24      A   Rubber-tired end loaders.
GARRETT REPORTING SERVICE
Post
Charleston,

PAGE 115

**115**

1       Q   The what?  I'm sorry.
2       A   The rubber-tired end loaders.
3       Q   Okay.  You drive one of these --
4       A   Uh-huh (yes).
5       Q   -- like a truck?
6       A   Yeah, well, you operate it just -- yeah.
7 Yeah.
8       Q   Okay.  Well, do you have to have --
9 you'd been trained -- well, the loader was the primary
10 job responsibility --
11      A   Yeah.
12      Q   -- you had, right?
13      A   Loading coal.  Loading dirt.  Loading
14 rock.
15      Q   And this accident happened in '08, you
16 were driving a loader?
17      A   Uh-huh (yes).
18      Q   Was Terry driving a loader?
19      A   Uh-huh (yes).
20      Q   Why were you driving a loader?  I mean
21 were you moving it from one place to another?
22      A   We were moving from the parking lot to
23 the pit.
24      Q   To -- to the pit where you'd be loading
GARRETT REPORTING SERVICE
Post
Charleston,

PAGE 116

**116**

1 the coal?
2       A   Yeah.  Uh-huh (yes).
3       Q   When -- when did this happen?  Beginning
4 of the shift?  After the shift?
5       A   Five (5:00) o'clock in the morning.
6       Q   So and -- and you were involved in the
7 accident?
8       A   Uh-huh (yes).
9       Q   Walk me through the -- the accident.
10      A   I had all this -- I'd come out of the
11 lot and Terry went down the hill and spun around
12 sideways in the road -- sitting sideways, and I come
13 down behind him and he didn't holler and say that he
14 was there, and the road was solid ice and I slid off
15 the hill.
16      Q   Were you injured?
17      A   Nicked him -- no.  No one was injured.
18      Q   Terry wasn't either?
19      A   No.
20      Q   So you're --
21      A   Just a minor little bump.  It wasn't --
22 that's all there was to it.
23      Q   Okay.  Was -- was there any -- any
24 property damage to either loader?
GARRETT REPORTING SERVICE
Post
Charleston,

PAGE 117

**117**

1       A   No.  One loader had a little dent in the
2 handrail.
3       Q   And -- what did -- the loader did?
4       A   Yeah, the loader did.
5       Q   Any other damage?
6       A   No.
7       Q   Which loader was it that had the dent in
8 it?
9       A   Terry's loader.
10      Q   Was the roadway damaged in any way?
11      A   No.
12      Q   So you leave the parking lot and --
13 well, Terry leaves the parking lot first?
14      A   Uh-huh (yes).
15      Q   Did he go down a hill?
16      A   Yeah.
17      Q   What kind of grade did this hill have to
18 it?
19      A   I don't --
20      Q   So was it steep or --
21      A   Pretty steep.
22      Q   You said it had iced over?
23      A   Yeah.
24      Q   Was it -- was it snowing?
GARRETT REPORTING SERVICE
Post
Charleston,

Ernest Alderman vs. Fola Coal Company LLC, et al.
*Deposition of Joseph Edward Fitzwater*
April 22, 2011

SHEET 31   PAGE 118

**118**

1     A  Snowing.
2     Q  Okay.  Had the -- well, did -- does Fola
3  clear the roads up there?
4     A  They -- generally we do and they do,
5  whoever's out there.
6     Q  What do they do in terms of clearing the
7  roads?  What --
8     A  We take the loaders and clean the snow
9  off the roads, and then put gravel on where we got it.
10     Q  Someone else comes back behind you and
11  puts the gravel down?
12     A  No, we do it.
13     Q  The loader does?
14     A  Uh-huh (yes).
15     Q  Do you --
16     A  Unless the cinder truck's running around
17  there somewhere.
18     Q  On -- on this morning Terry leaves the
19  parking lot, what -- what is he doing?  Is he just on
20  his way to the job site?
21     A  Yeah.
22     Q  Is he involved at all in clearing the
23  road?
24     A  Well, he just -- he's -- I guess he was

GARRETT REPORTING SERVICE
Post
Charleston,

PAGE 119

**119**

1  trying to.
2     Q  Were -- were you cleaning the road or
3  trying to clear the road?
4     A  Yeah.
5     Q  And how did -- how do you do that in a
6  loader?
7     A  You just plow the snow.
8     Q  Okay.  And you put the gravel down, too?
9     A  Yeah.
10     Q  How -- how do you do that in a loader?
11     A  Well, you come back up, put the gravel
12  down there if you can get the snow off.  You've got a
13  little bucket on your machine.
14     Q  Okay.  And you're -- you're putting
15  fresh gravel down?
16     A  Yeah.
17     Q  Okay.  You're not putting any type of
18  salt or cinder down in that --
19     A  Well, salts -- well, no, it ain't --
20  it's not salt.  Just little gravel is what we normally
21  use.
22     Q  Oh, you're talking like the little
23  gravels, not --
24     A  Yeah.  Little gravel.  No. No. No. No.

GARRETT REPORTING SERVICE
Post
Charleston,

PAGE 120

**120**

1     Q  Not like that that size (indicating)?
2  Okay, I see.  So it's -- it's sort of like a cinder-
3  type material --
4     A  Yeah.  Uh-huh (yes).
5     Q  -- but it's a little bigger?
6     A  Yeah.
7     Q  All right.  So you -- you're doing that
8  on the -- on the loader?
9     A  Yeah.
10     Q  Were you doing it that morning?
11     A  We was getting ready -- no, we wasn't
12  putting no cinders down.  We didn't have any.
13     Q  Were -- were you putting down the little
14  gravel that morning?
15     A  No, sir, we didn't have any.
16     Q  Were you plowing the snow that morning?
17     A  Yes.
18     Q  Was Terry plowing the snow that morning?
19     A  Yes.  Well, we was just working it as we
20  went to -- to the pit.
21     Q  What was discussed at the safety meeting
22  about that issue?
23     A  We really didn't -- never did have a
24  safety meeting on.  We just discussed it with the

GARRETT REPORTING SERVICE
Post
Charleston,

PAGE 121

**121**

1  safety director -- or I did.
2     Q  Okay.
3     A  And he -- we took it that maybe we'd
4  better get some more -- get some gravel up there and
5  get on the road and fix the -- if it piled up for --
6  so it wouldn't happen again.  That was between Doug
7  Martin and -- well, I thought that Doug was the safety
8  director.
9     Q  You spoke to Doug?
10     A  Yeah.
11     Q  Did you speak to anyone else?
12     A  Yeah.  I can't think of what his name
13  was right now.
14     Q  Would it have been Bill Walters --
15     A  No.
16     Q  -- back in those days?
17     A  No.  It wasn't no safety man.  It was a
18  pit boss.
19     Q  Karl Fitzwater?
20     A  No, it wasn't Karl.
21     Q  A foreman like that?
22     A  Yeah.  What was that other one's name
23  out there?  Skeeter?  Well, Skeeter --
24     Q  Charles Hackworth?  Was that Skeeter?

GARRETT REPORTING SERVICE
Post
Charleston,

Ernest Alderman vs. Fola Coal Company LLC, et al.
*Deposition of Joseph Edward Fitzwater*
April 22, 2011

SHEET 32  PAGE 122

**122**

1 A I don't know.
2 Q Well, his -- his nickname is Skeeter,
3 the person you're speaking of?
4 A Yeah, Skeeter. I -- I can't think of
5 what -- I don't know what his name is. That's close
6 enough.
7 Q I think his name is Charles Hackworth.
8 A He is -- he's the one -- he is the one
9 that come up and investigated. He -- we -- he was
10 called to come up and see what took place.
11 Q And he spoke to you?
12 A Yes, sir. We -- we stood there and he
13 busted his setter when he got out of the truck on the
14 ice.
15 Q He -- he fell on the ice when he got out
16 of the truck?
17 A Yeah.
18 Q Fell on his rear?
19 A Uh-huh (yes).
20 Q Did you and -- what did you and Skeeter
21 talk about?
22 A He just -- we just talked about getting
23 the road straightened up before we proceeded any
24 further.
  GARRETT REPORTING SERVICE
  Post
  Charleston,

PAGE 123

**123**

1 Q Okay. Did he ask you what had happened?
2 A He -- yeah, he --
3 Q And your explanation to him as to what
4 happened, was it the same as what you just told me as
5 to what happened?
6 A Yes, sir. Same thing I told Doug
7 Martin.
8 Q Was Terry present when you were talking
9 to Skeeter?
10 A I -- yeah, he was standing there.
11 Q What did Terry say --
12 A I don't know.
13 Q -- as to what happened?
14 A I ain't sure what Terry said. I wasn't
15 -- he wasn't -- I don't even think Terry said anything
16 while we was standing there.
17 Q Do you know if Terry has a version of
18 events that's any different than what you've told me?
19 A Not that I'm aware of, he doesn't. Doug
20 Martin seemed to be satisfied when I talked to him,
21 and he'd done talked to Terry. And --
22 Q When did you talk to Doug? Before or
23 after you talked to Skeeter?
24 A After.
  GARRETT REPORTING SERVICE
  Post
  Charleston,

PAGE 124

**124**

1 Q What -- what did you and Doug discuss?
2 A He just -- he called me on the telephone
3 and asked me -- told me had to fill out a report on
4 it, which is standard procedure.
5 Q Uh-huh (yes).
6 A And asked me what happened, and I
7 explained to him. He agreed, too, that we needed to
8 get some gravel up there.
9 Q Did he tell you anything else?
10 A That's all he told me.
11 Q Did you ex -- give him any additional
12 information?
13 A I -- not that I'm aware of. I don't
14 remember just what all was discussed.
15 Q Now, when -- when conditions are either
16 snow-covered roads or icy like it was that day, are
17 you supposed to exercise additional caution when
18 operating the loader?
19 A Well, you got to clear the roads. You
20 have to do what you --
21 Q Sure, but are you supposed to use a
22 little bit more caution than you might just if you
23 were driving the loader on the --
24 A Oh, yes. You have to use more caution
  GARRETT REPORTING SERVICE
  Post
  Charleston,

PAGE 125

**125**

1 when roads is in that kind of condition.
2 Q And -- and -- and what kind of caution
3 are you to exercise? Can you give me any particular
4 examples?
5 A I mean you just don't run fast. You run
6 slow. You take -- you know, you --
7 Q So you slow down?
8 A You use common sense.
9 Q Is there a speed limit that these
10 loaders are supposed to be going?
11 A Not that I'm aware of.
12 Q On the day in question, did you slow
13 down?
14 A Yes.
15 Q Had Terry slowed down?
16 A Yes, far as I know he had. He was out
17 in front of me.
18 Q What else do you do in terms of
19 exercising -- using your common sense when the
20 conditions are like that?
21 A You just use common sense. I don't
22 know.
23 Q Okay. And do you -- you go -- you go at
24 a slower pace. Do you keep a safer distance from the
  GARRETT REPORTING SERVICE
  Post
  Charleston,

Ernest Alderman vs. Fola Coal Company LLC, et al.
*Deposition of Joseph Edward Fitzwater*
April 22, 2011

SHEET 33   PAGE 126

126

1 loader in front of you?
2    A  Yeah, you were -- yes -- I was -- you
3 just -- you're supposed to stay 200 feet apart from
4 each other anyway, I think it is.
5    Q  Even on a clear day -- 200 feet?
6    A  Yeah, you're supposed to take -- well,
7 you've got a certain distance you need to stay away
8 from them.  I won't give it the 200 feet, but a
9 reasonable of distance.
10    Q  Were you told a precise distance as to
11 how far to stay away?
12    A  No.  No.
13    Q  Where did you come up with a few hundred
14 feet at?
15    A  My -- on the -- I mean just that's just
16 the way I figure it.
17    Q  Okay.
18    A  If you're too far -- 100 feet away from
19 somebody on a slick day, you're -- but you've got to
20 understand me.  You're plowing snow.  You run a little
21 ways and you throw it over the side; you run a little
22 ways and you throw it to the side.
23    Q  Okay.
24    A  You don't -- you don't take off and run
GARRETT REPORTING SERVICE
Post
Charleston,

PAGE 127

127

1 down a highway 60 mile an hour.
2    Q  Right.  But -- but it's still advisable
3 to stay 200 feet or so back?
4    A  It's -- yeah, it pays to stay away.
5    Q  Is that what you considered a reasonable
6 distance -- 200 feet?
7    A  I'd say it -- it's --
8    Q  If you were any closer than 200 feet,
9 would that be unsafe?
10    A  No, not necessarily.
11    Q  Would it be unreasonable on a slick day
12 like that?
13    A  No.  No, not --
14    Q  If you're going down a hill, you should
15 -- think you should stay 200 feet back?
16    A  If you're going down it -- I'd -- it
17 just -- you'd just have to be there at the time.  I
18 mean it -- that's --
19    Q  So you have to use your judgment as to
20 whether you're --
21    A  That's the bottom line to it.  You have
22 to use judgment.
23    Q  As to whether you're a reasonable
24 distance apart?
GARRETT REPORTING SERVICE
Post
Charleston,

PAGE 128

128

1    A  Yeah.
2    Q  And on a slick day like that, 200 feet
3 would have been a reasonable distance?
4    A  Well, 200 feet -- that was -- the road
5 probably wasn't 250 feet -- or, well, it might have
6 been longer than that.  Yeah, I'm going to say 200
7 feet would have been good.
8    Q  Did you and Skeeter discuss anything
9 else other than what we just talked about?
10    A  No.
11    Q  Did you and Doug discuss anything else
12 other than what we've just talked about?
13    A  No.
14    Q  Did Skeeter say who was at fault in
15 terms of the accident?
16    A  No.
17    Q  Did Doug say who was at fault?
18    A  No.
19    Q  Now, the way this worked is Terry had
20 gone down the hill first and he went to the side.
21 What happened?
22    A  He slid sideways around -- he turned
23 sideways in the middle of the road -- slid sideways in
24 the middle of the road.
GARRETT REPORTING SERVICE
Post
Charleston,

PAGE 129

129

1    Q  All right.  And then you're coming down
2 the hill behind him.
3    A  Yeah.
4    Q  And you strike him?
5    A  Uh-huh (yes).
6    Q  T-bone him?
7    A  Yeah, the more or less T-bone.
8    Q  Couldn't get the -- couldn't get the
9 loader stopped?
10    A  It would not stop on solid ice.
11    Q  Right.  What -- what actions did you
12 take to try to stop it?
13    A  I rolled the bucket down, put the teeth
14 in the -- down, and let it go down the hill.
15    Q  Rolled the bucket down?  Put the teeth
16 down?
17    A  Yeah, put the teeth in the ground.
18    Q  Anything else?
19    A  That was all you could do.
20    Q  Were -- were you -- in a situation like
21 that were you instructed as to how you were to go
22 about trying to get the loader stopped?
23    A  I -- I don't know if we ever discussed
24 it or not.
GARRETT REPORTING SERVICE
Post
Charleston,

Ernest Alderman vs. Fola Coal Company LLC, et al.
*Deposition of Joseph Edward Fitzwater*
April 22, 2011

SHEET 34   PAGE 130

**PAGE 130**

1  Q  Was there anything else you could have
2  done to get that loader stopped that day in question?
3  A  No, sir.
4  Q  How far were you from Terry on that day
5  before he slid -- or at the time he slid?
6  A  Oh, from the time he slide, I don't
7  know.  He was out of sight of me.  I never seen him.
8  Q  You don't know far you were from him?
9  A  Oh, he was probably 100 yards down the
10 hill somewhere.  Fifty yards.  I don't know.
11 Q  When he slid -- turned around in the
12 road, did he radio back to you?
13 A  No.
14 Q  He didn't?
15 A  No.
16 Q  Is that the policy that you should radio
17 back?
18 A  Well, I don't know that he -- I don't
19 know.  I don't know what the policy was.  It never had
20 occurred before.
21 Q  Were you disciplined in any way as a
22 result of that incident?
23 A  Not that I'm aware of.
24 Q  Was Terry?
GARRETT REPORTING SERVICE
Post
Charleston,

**PAGE 131**

1  A  Not that I'm aware of.
2  Q  Was anyone else?
3  A  Not that I'm aware of.
4  Q  Was anyone else involved in the
5  accident?
6  A  No.
7  Q  Just you and Terry?
8  A  That's all.  Like I say, it was just --
9  we discussed it with Doug and Doug decided that we
10 needed to put gravel up there and get the road
11 graveled.
12 Q  Okay.
13       (WHEREUPON, a document was marked
14       for identification as Deposition
15       Exhibit No. 6, and is attached
16       hereto.)
17 BY MR. LEONORO:
18 Q  The court reporter has handed you what's
19 been marked as Deposition Exhibit 6.  And I will state
20 for the record that's a document titled, "Safety
21 Training Guidelines."
22       Is that something you recognize, Mr.
23 Fitzwater?
24 A  (Witness examines document.)  Yeah, I
GARRETT REPORTING SERVICE
Post
Charleston,

**PAGE 132**

1  think we've discussed this.  Evidently I --
2  Q  Does that appear to set forth some of
3  Fola's safety guidelines?
4  A  Yeah, but -- somewhat.
5  Q  Could you take a look at that document
6  and let me know if there's anything on that document
7  that's inaccurate?  In other words, if there's any --
8  any guideline listed here that -- that was not
9  actually the policy at Fola when you worked there?
10 A  I couldn't read over that and tell you
11 that right now.  I'd have to do too much thinking.
12 Q  I mean, you can take your time there.
13 A  No, if you got a question you want, just
14 go ahead and answer [sic] it and then we'll discuss
15 it.
16 Q  Well, you see the first bullet point
17 says, "Obey all posted traffic rules, signals and
18 warning signs"?
19 A  Yeah.
20 Q  Did you understand that you were
21 supposed to do that?
22 A  Yes, sir.
23 Q  Did Fola have a -- did they give you
24 traffic rules to follow?
GARRETT REPORTING SERVICE
Post
Charleston,

**PAGE 133**

1  A  I -- I -- I guess we had traffic rules.
2  Don't drive on the wrong side of the road.  I think
3  the speed limit was 25 mile an hour.  Observe the
4  posting of the CB channels.  Yeah, we had that.
5  (Witness examines document.)  Follow at a safe
6  distance in the fog.
7  Q  Where -- where is that at?
8  A  The second page.
9  Q  Where it says, "Keep a safe following
10 distance"?
11 A  Yeah.
12 Q  Did you understand that, when you're
13 operating a piece of equipment, you were to keep at a
14 safe following distance?
15 A  Yeah.
16 Q  We just talked about that, right?
17 A  Yeah.
18 Q  And there it also says, "Reduce speeds
19 where conditions warrant such as steep grades, around
20 curves at night, in congested areas and under wet,
21 snowy, icy or foggy conditions."
22 A  Yeah
23 Q  And is that what you were to do?  You
24 were to reduce speeds in those situations?
GARRETT REPORTING SERVICE
Post
Charleston,

Ernest Alderman vs. Fola Coal Company LLC, et al.
*Deposition of Joseph Edward Fitzwater*
April 22, 2011

SHEET 35  PAGE 134

134

1    A  Yeah.  But like I said, we wasn't --
2  couldn't -- we was pushing snow to the side of the
3  road so we wasn't speeding.  You were doing more
4  trying to stop.
5    Q  So as we sit here today, you're not sure
6  -- when Terry's coal loader started to slide, you're
7  not sure what distance you were from him?
8    A  No, he was way down the hill beyond --
9  in front of me.
10    Q  How far down the hill?
11    A  I'm going -- 600, 700 feet.  He was
12  around the curve out of sight.
13      (WHEREUPON, a document was marked
14      for identification as Deposition
15      Exhibit No. 7, and is attached
16      hereto.)
17    BY MR. LEONORO:
18    Q  The court reporter has handed you what's
19  been marked as Deposition Exhibit 7.  I'll state for
20  the record it's an Injury, Illness, Near Miss Report
21  dated January 19, 2009.  Have you seen this document
22  before, Mr. Fitzwater?
23    A  No, sir, I haven't.
24    Q  You see at the top where it says,

GARRETT REPORTING SERVICE
Post
Charleston,

PAGE 136

136

1  snow covered."
2    A  Yeah.
3    Q  Did I just read that right?
4    A  That's -- yeah.
5    Q  All right.  Is that an accurate
6  representation of what happened on the day in
7  question?
8    A  Well, it never punctured no tire.
9    Q  It did not?
10    A  No.
11    Q  Okay.
12    A  But if that's what I say, there was a
13  dent in the handrail.
14    Q  Other than that you don't think it
15  punctured the tire, is there -- is there anything else
16  about that -- those four or five lines --
17    A  No, sir, that's -- that's --
18    Q  -- or six lines, that's accurate?
19    A  I -- I'd say it's accurate.
20    Q  And just so I'm clear, who's in the 242?
21    A  Terry.
22    Q  So you -- he's in the 242; you're in the
23  238?
24    A  Yeah, he's the one that slid sideways in

GARRETT REPORTING SERVICE
Post
Charleston,

PAGE 135

135

1  "Employee involved" and it has your name on it and
2  Terry Messinger's name on it?
3    A  Yes, sir.
4    Q  And you can take a better look at it if
5  you'd like to.
6    A  I --
7    Q  You -- you look at it if you'd like to
8  take a look.
9    A  Go ahead, I'm -- I really can't read his
10  writing.
11    Q  All right.  Do you know who filled this
12  out?
13    A  (Witness examines document.)  Well, it
14  must have been Skeeter.  It says, "Name of
15  investigator" is Skeeter Hackworth.
16    Q  Do you see where it says, "Describe
17  fully the conditions"?  Can you -- can you make that
18  word out?  Well, I --
19    A  Yeah, okay, yeah.
20    Q  It says, "When coal loader leaving
21  parking lots toward the intersection, 244 slide into
22  ditch and 238 lost control, slide into coal loader
23  242, bending handrail and punctured back tire on 242.
24  Both operator wearing seat belt.  Road was icy and

GARRETT REPORTING SERVICE
Post
Charleston,

PAGE 137

137

1  the ditch, right on the road.
2    Q  And then you lost control and slid into
3  him?
4    A  Well, it's -- I slid down the hill.  I
5  guess you could say I lost control.
6    Q  And then it says, "Steps taken to
7  prevent reoccurrence.  It says there, "Coal loader
8  need to space theirself out 100 feet apart when icy
9  condition."  Do you see that?
10    A  Yeah, it's -- that's his.
11    Q  Why do you think he put 100 feet?
12    A  Well, maybe that's his -- that's his
13  opinion of how far apart we should have been.
14    Q  Do you think you were less than 100 feet
15  apart on that day?
16    A  No, sir, we was two or 300 feet apart.
17    Q  Is that what Terry would say if he were
18  questioned about it?
19    A  I assume that's what he would say.
20    Q  Do you know if anyone witnessed this
21  accident?
22    A  No, sir, there's nobody witnessed it.
23    Q  No one witnessed it?
24    A  No.

GARRETT REPORTING SERVICE
Post
Charleston,

Ernest Alderman vs. Fola Coal Company LLC, et al.
*Deposition of Joseph Edward Fitzwater*
April 22, 2011

SHEET 36   PAGE 138

138

1     Q   There's --
2     A   Not that I'm aware of.  I mean, if they
3 did, they never come forward.
4     Q   Sure.  There's a drawing here --
5     A   That's -- yeah.
6     Q   -- on the second page.
7     A   That's a pretty well accurate drawing,
8 too.
9     Q   Okay.  Looks like the two drawings are
10 the same on both pages.
11     A   Yeah, they are.
12     Q   That's a -- that's an accurate drawing
13 of what happened?  Let me just --
14     A   Yeah.
15     Q   -- take -- take you down this.  I mean
16 the coal loader parking lot, that's where you left
17 from, right?  Where it says "coal loader parking lot"?
18     A   Yeah.
19     Q   Bottom right-hand corner.
20     A   Yeah.  He writes like I do.
21     Q   It has a -- it has a little rectangular
22 -- does it say "bus" right there?
23     A   Yeah, that's a bus.  That's was on our
24 off -- that's our bus.  Our -- that's -- that was our
GARRETT REPORTING SERVICE
Post
Charleston,

PAGE 140

140

1 me where the curve is in this blue pen -- oh, sorry.
2     A   I mean it just goes down and kind of
3 curves around just a little bit there.  It's --
4     Q   All right.  The road does?
5     A   Yeah.
6     Q   I -- I think I see what you mean there.
7     A   And --
8     Q   Where did you lose control as you were
9 going down this hill?
10     A   Oh, probably --
11     Q   Put an "X" to the best -- best of your
12 memory.
13     A   I want to say right in here
14 (indicating).
15     Q   And then you slid the rest of that way
16 down --
17     A   Yeah.
18     Q   -- into 242?
19     A   Yeah.
20     Q   How far a distance was that from the
21 place you lost control till where your op -- your
22 dozer ended up?
23     A   I'd say --
24     Q   Not your dozer -- your loader.
GARRETT REPORTING SERVICE
Post
Charleston,

PAGE 139

139

1 office (indicating).
2     Q   Okay.  Like a trailer there?
3     A   Not, it was a bus.
4     Q   A bus?  Okay.  Like a school bus?
5     A   A school bus.
6     Q   Right.  And it's parked there?
7     A   Yeah.
8     Q   Is it flat there?
9     A   It's flat right where the bus is.
10     Q   Okay.  And then after the bus does it
11 start going downhill?
12     A   Downhill.  But now, there was a little
13 curve in that road right there if you want to --
14     Q   Where's the curve at?
15     A   Just as you go down the hill it kind of
16 curves around just -- not very much of a curve but a
17 little bit of curve down.  He just drawed it straight.
18     Q   Okay.  I'll -- I'll tell you what you
19 do.  On -- on that -- it's the same document but it's
20 -- it's the same copy.  There's just two copies of it
21 so on the --
22     A   Uh-huh (yes).  Just comes around and
23 just got a little bit of a curve in there.  It's --
24     Q   On -- on the first page there, draw for
GARRETT REPORTING SERVICE
Post
Charleston,

PAGE 141

141

1     A   -- it was -- I don't know.  Probably
2 100 feet.
3     Q   Okay.
4     A   Hundred and fifty (150).
5     Q   All right.  And how far is it from the
6 -- from the bus?  See where it says "bus"?  How far is
7 it from there to the place where you lost control?
8     A   I -- I don't know.  Five, 600 feet.
9     Q   Okay.
10     A   I never measured.  I never --
11     Q   It's a greater distance from the bus to
12 where you lost control?
13     A   Yeah.
14     Q   Than it is from where you lost control
15 to where you ended up?
16     A   Uh-huh (yes).
17     Q   So is he -- did -- going back to this
18 exhibit, do you know where it was that Terry lost
19 control?
20     A   I -- I'm not really sure, sir.
21     Q   Do you know if it was around that turn,
22 that curve --
23     A   It was --
24     Q   -- that you drew?
GARRETT REPORTING SERVICE
Post
Charleston,

Ernest Alderman vs. Fola Coal Company LLC, et al.
*Deposition of Joseph Edward Fitzwater*
April 22, 2011

SHEET 37   PAGE 142

142

1       A  -- kind of -- yeah, it was about
2  somewhere about the same -- in the area that I did.
3       Q   Do you think you should have waited
4  until Terry got around that curve before you took off?
5       A   He was off of the hill.  I mean he was
6  already out of sight of me when he -- when I took off.
7       Q   All right.  Did you -- on this day of --
8  in question, this -- when this accident happened, did
9  you -- was any of your conduct unsafe?
10       A   No, sir.  I was doing what I was told
11  to.
12       Q   Was Terry's conduct unsafe?
13       A   Not that I -- far as I know, it wasn't.
14       Q   Who had instructed you to clear the road
15  that day?
16       A   I mean that was just standard procedure.
17  When we left, we start cleaning the roads.
18       Q   On that day did anybody tell you to
19  clear the road?
20       A   I -- just -- I guess Dan Cook did.  I
21  mean --
22       Q   You can't remember, though, as you sit
23  here today?
24       A   I -- I mean I don't know specific -- I
    GARRETT REPORTING SERVICE
    Post
    Charleston,

PAGE 143

143

1  don't know that Dan would have specifically said,
2  "Clean the roads."  I mean it's --
3       Q   Did --
4       A   -- that's standard procedure that when
5  we left the office to maintain the roads to get
6  everything ready --
7       Q   Were you --
8       A   -- to run.
9       Q   Were you given any specific instructions
10  on that day as how to go about clearing the road in a
11  safe manner?
12       A   No, sir.
13       Q   Were you involved in any other accidents
14  when you worked at Fola?
15       A   Not that I'm aware of -- I remember.
16       Q   Did you miss any work as a result of
17  that accident?
18       A   No, sir.  We done what the company
19  required of us.  When it happened, we notified the
20  foreman to come and look at it.  Before we ever moved
21  or anything else we followed company rules to the --
22  what we was supposed to.
23       Q   In your work did you work around the
24  high wall?
    GARRETT REPORTING SERVICE
    Post
    Charleston,

PAGE 144

144

1       A   Every day.
2       Q   Is that what you did when you were in
3  that -- on the loader?
4       A   Yeah.
5       Q   Does the loader -- when you -- when you
6  were working on the loader, are you required to keep a
7  certain distance from the high wall?
8       A   No, sir.
9       Q   You're not supposed to keep a distance
10  from the high wall?
11       A   No, sir.  How else would -- how would
12  you get the coal out from under the wall if you stayed
13  away from it?
14       Q   What -- what -- what's the policy of --
15  well, strike that.
16       What's the tooth on a loader?
17       A   That's the things on the end -- on the
18  end of the bucket that you break the coal up with.
19       Q   Right.  And that's -- that's the device
20  that's pulling it out?
21       A   Yeah.
22       Q   All right.  And you -- you move the
23  tooth, I guess, from side to side?  I mean you move
24  it?
    GARRETT REPORTING SERVICE
    Post
    Charleston,

PAGE 145

145

1       A   No, no, no.  They stay permanent --
2  fixed.  You have to take them off every once in awhile
3  and turn them over.
4       Q   All right.  Well, do you have to turn
5  the tooth?
6       A   Yeah.
7       Q   Okay.
8       A   After you wear them so long on one side
9  they get dull and you flip them over.
10       Q   You -- you remember a time when you were
11  turning the tooth and when you did that, you knocked
12  the pin out, and the pin fell and struck your foot?
13       A   No, the tooth fell and struck my foot.
14       Q   The tooth fell, not the pin?
15       A   Yeah, the tooth fell and struck my foot.
16       Q   All right.  How -- how is it that the
17  tooth struck your foot?
18       A   It just slid off the end of the shank.
19       Q   What's the shank?
20       A   That's the piece that tooth attaches to.
21       Q   How -- how did it strike your foot?
22       A   It just -- well, it slid off there and
23  hit the ground and popped over and hit my own foot.
24       Q   Was your foot inside the cab when that
    GARRETT REPORTING SERVICE
    Post
    Charleston,

Ernest Alderman vs. Fola Coal Company LLC, et al.
*Deposition of Joseph Edward Fitzwater*
April 22, 2011

SHEET 38   PAGE 146

146

1 happened?
2     A   No, sir, it was on the ground.
3     Q   Okay.  So you were -- you weren't inside
4 the cab operating the equipment?  You were outside?
5     A   No, no.  We was on -- outside standing
6 on the ground.
7     Q   Changing the tooth?
8     A   Flipping, yeah.
9     Q   Flipping it over?
10     A   Flipping the tooth over.
11     Q   All right.  Why were you doing that?
12     A   Because you have to flip them over.
13 After they wear so long on one side you have to turn
14 them over in order to get them to work proper.
15     Q   I understand.  I understand.
16     A   You know how a pocket knife is when you
17 sharpen a pocket knife?  Okay.
18     Q   It's just a matter of, sort of,
19 sharpening it?
20     A   Yeah.
21     Q   Okay.  And when you're -- when you're
22 turning the -- the tooth over -- when you did this, I
23 mean, was your -- your foot was struck and you injured
24 your foot?
    GARRETT REPORTING SERVICE
    Post
    Charleston,

PAGE 147

147

1     A   It just -- well, it, now, right -- I
2 didn't really injure it, it just -- I mean it hit it.
3     Q   Okay.  But you weren't injured at all in
4 that incident?
5     A   Well, not necessarily.  I mean it --
6 company policy, when you done something like that
7 tooth hit me on the foot, then you turned in a -- it
8 happened, I mean, you know.
9     Q   Okay.  And did you report that to
10 someone?
11     A   Yes, sir.
12     Q   Who did you report it to?
13     A   My supervisor.
14     Q   Who was that?
15     A   Steve Hicks.
16     Q   Okay.  Did -- is the company policy that
17 you report the incident on the day it happens?
18     A   If you can report it then.
19     Q   What do you mean by that?
20     A   If -- if you're -- if he's there.
21     Q   Well, if -- if Steve Hicks isn't there,
22 should you report to someone else?
23     A   Well, I'd -- as long as you report it.
24 I mean that's --
    GARRETT REPORTING SERVICE
    Post
    Charleston,

PAGE 148

148

1     Q   You're -- you're supposed to report it
2 to a supervisor, an incident like that?
3     A   Well, I -- you -- I reported it the
4 supervisor.
5     Q   On -- on the day that that happened when
6 the -- when the tooth fell on your foot, did you
7 report it to a supervisor that day?
8     A   I -- no, I think I called Mr. Hicks the
9 next morning because he wasn't there.
10     Q   Why is --
11     A   I think I told Dan or one of them.
12     Q   Who's Dan?
13     A   The plant -- the boss or --
14     Q   The crew leader?
15     A   Yeah.
16     Q   Why is it that you didn't tell Mr. Hicks
17 about the injury, or, not the injury --
18     A   He wasn't there.
19     Q   -- the incident?  Okay.  But you think
20 you told Dan that day?
21     A   Yeah.  In fact, I had told Mr. Hicks on
22 the telephone to tell him after I finally got him run
23 down.
24         (WHEREUPON, a document was marked
    GARRETT REPORTING SERVICE
    Post
    Charleston,

PAGE 149

149

1         for identification as Deposition
2         Exhibit No. 8, and is attached
3         hereto.)
4     BY MR. LEONORO:
5     Q   The court reporter is handing you what's
6 been marked as Deposition Exhibit 8.  Take a minute
7 and read that if you need to.  I'll just represent for
8 the record it's a "Mine Accident, Injury and Illness
9 Report" dated December 15, 2008.
10     A   Uh-huh (yes).  (Witness examines
11 document.)  And it's --
12     Q   Have you seen this document before?
13     A   No, sir, not that I -- I don't remember
14 seeing it.
15     Q   All right.  Well, let's walk through it.
16 Your name's a top -- on the top, right?
17     A   Yes, sir.
18     Q   And dated December 15, 2008?
19     A   Uh-huh (yes)
20     Q   It notes that the accident happened two
21 days before on December 13, 2008; is that correct?
22     A   At -- I don't know.  I don't remember
23 just what day -- I know I called him.  I called him
24 when he was back in, you know -- back in his office.
    GARRETT REPORTING SERVICE
    Post
    Charleston,

Ernest Alderman vs. Fola Coal Company LLC, et al.
*Deposition of Joseph Edward Fitzwater*
April 22, 2011

SHEET 39   PAGE 150

150

1 I mean I called and he wasn't there and --
2        Q  Did this --
3        A  -- I called him back.
4        Q  Did this incident happen in December of
5 2008?
6        A  I'm assuming it did.
7        Q  All right.  I mean --
8        A  I ain't got no reason to question the
9 date on the paper.  I mean it --
10       Q  Okay, but let's walk through that first
11 part.  It has --
12       A  Yeah.
13       Q  -- 9:00 a.m.  Is that when the in -- the
14 incident happened?
15       A  The date and time of accident -- I --
16 I'm really not sure what time it was
17       Q  And there's a question there:  "Did the
18 injury/illness require medical attention?"  You put,
19 "No" -- or someone put, "No."
20       A  No, there was no -- the only -- they
21 wasn't no -- it was company policy if something
22 happened, you notify them and tell them.
23       Q  I understand.  But -- and -- and that's
24 a correct statement there that there was no -- that
GARRETT REPORTING SERVICE
Post
Charleston,

PAGE 151

151

1 the injury or illness didn't require medical
2 attention, correct?
3        A  No.
4        Q  All right.  You -- you didn't -- you
5 didn't require medical attention that day?
6        A  No.
7        Q  Okay.  Then there's a discussion below
8 that as to what happened; do you see that?
9        A  "Employee was turning the tooth and the
10 -- knocked the pin out and the foot -- it hit him on
11 the foot."  Is that the one you're talking about?
12       Q  Right.
13       A  Okay.  Yes, sir.
14       Q  Is that --
15       A  That's --
16       Q  -- an accurate description?
17       A  -- that's about as accurate as you can
18 get.
19       Q  Do you know why the pin was knocked out?
20       A  I hit it with a hammer.
21       Q  Okay.  Is that part of -- is that what
22 you were supposed to do?
23       A  That's the way you --
24       Q  To turn it?
GARRETT REPORTING SERVICE
Post
Charleston,

PAGE 152

152

1        A  -- change it.  That's the way you turn
2 it.  You take it -- you take two hammers, one of
3 them's got a pin on it and one of them's got a point
4 on it, and you hit it and you knock the pin out.
5        Q  All right.  I see.  And then is -- below
6 that it says, "Employee called information in on
7 Monday 12/15/08."  Any reason to dispute that?
8        A  No, I'm not going to.  Like I say, I
9 tried calling him and calling him and calling him
10 before I ever got a hold of him, so I don't know what
11 time it was.  That was my day off.  I mean that's --
12 that's the reason I had to call him because I was off.
13       Q  Did you leave him a message?
14       A  I -- I don't know whether I did or not,
15 to be honest with you.
16       Q  Did you tell Steve that you'd been
17 trying to call him?
18       A  I assume I did.  I -- I mean I -- I
19 guess I tried to tell him -- I told him I'd been
20 trying to get a hold of him.  I don't know just what
21 the conversation was when I first talked to him.
22           But I mean this goes back to I done what
23 I was supposed to do.  The injury occurred -- or,
24 well, there wasn't no injury.  The incident occurred.
GARRETT REPORTING SERVICE
Post
Charleston,

PAGE 153

153

1 I took the proper steps.  And when I got back -- when
2 he come into his office to when I could get a hold of
3 him, I got a hold of him and told him.  What more do
4 you think that could be done?
5        Q  Did you try to call Steve Hicks on the
6 day the -- of the incident?
7        A  No, I -- I don't know if I tried calling
8 him that day or not.  It was already late in the
9 evening.
10       Q  And was it the policy that you were
11 supposed to advise Steve Hicks of an incident on the
12 day it happened?
13       A  I don't know that there was a policy
14 that I was supposed to notify him immediately.  I mean
15 there was no injury occurred.  It just happened and --
16       Q  Did anyone witness that happen?
17       A  I don't think so.
18       Q  It - it happens that -- based on this
19 document, it happens on December 13.
20       A  I won't -- now, I -- I won't dispute
21 that word and I won't -- I don't know on that dates.
22 I don't know the dates.
23       Q  If this is accurate, if it did happen on
24 December 13?
GARRETT REPORTING SERVICE
Post
Charleston,

Ernest Alderman vs. Fola Coal Company LLC, et al.
*Deposition of Joseph Edward Fitzwater*
April 22, 2011

SHEET 40   PAGE 154

154

1     A  I thought -- I thought I called him the
2  next morning after it happened.  It happened that
3  evening and I called him the next morning, my
4  recollection.  Now, it's a possibility that he got the
5  times wrong or the dates wrong or --
6     Q  Okay.  Or it's a possibility that your
7  recollection is -- is wrong a bit --
8     A  Hell, I don't --
9     Q  -- that you called him on December 15th?
10     A  -- really think so.  It -- it's -- it --
11  again, I'd have to look at a cam -- a calendar.  I
12  knew that I told him when -- just as soon as I
13  knew he'd be back in his office, which, if that was
14  on a Monday morning, then I --
15     Q  Did he work over the weekend?
16     A  No, sir.  Steve didn't work.  He was a
17  lot -- had a lot of jobs.  It might go sometimes two
18  weeks before I ever seen Steve.
19     Q  When you're changing the tooth or
20  turning the tooth, where -- where are you supposed to
21  have your -- your feet at when you're doing that?
22     A  Well, sir, the teeth stick out in front
23  of the bucket (indicating).
24     Q  Uh-huh (yes).

GARRETT REPORTING SERVICE
Post
Charleston,

PAGE 155

155

1     A  And when you're standing there and knock
2  that pin out, then your feet are right in front of the
3  bucket.
4     Q  Okay.  So by doing that there's a risk
5  that your -- that the tooth is going to fall and hit
6  your feet?
7     A  Yeah, it -- it just -- it's a -- it
8  usually they'll hang right there on the thing.
9     Q  Okay.
10     A  And for that one there, for some reason
11  just when the pin come out, it just slid over and
12  jumped down.
13     Q  Okay.  When you're knocking it out like
14  that there are you supposed to have your feet farther
15  away from the piece of equipment?
16     A  Well, sir, you can't stand there and
17  reach out.
18     Q  Could you stand behind it and knock the
19  pin out that way?
20     A  I guess you could go get somebody to
21  come and do it for you, and you can stand over to the
22  side and watch them do it.
23     Q  Well, were you given instructions as to
24  how you --

GARRETT REPORTING SERVICE
Post
Charleston,

PAGE 156

156

1     A  I don't remember --
2     Q  -- body was to stand?
3     A  -- ever being given instructions on how
4  to do it.
5     Q  All right.  Did anyone investigate this
6  incident?
7     A  No, sir.
8     Q  After you called and reported it, did
9  anyone come and talk to you?
10     A  No, not that I know of.
11     Q  Do you see that signature at the bottom?
12     A  I see something down there.  I don't
13  know what it is.
14     Q  Do you have any idea whose signature
15  that might be?
16     A  No, sir, I -- it don't even look like a
17  name to me.  Looks like a "two something."
18     MR. ASBURY:  Looks like it says
19  "2nd letter" to me, counsel.
20     THE WITNESS:  I don't know what it
21  says.
22     MR. LEONORO:  Yeah, I can't -- I
23  admit I don't -- I can't make it out.  I don't
24  know what it is.

GARRETT REPORTING SERVICE
Post
Charleston,

PAGE 157

157

1     BY MR. LEONORO:
2     Q  You see where it says, "Steps taken to
3  prevent recurrence of accident.  Body position
4  awareness"?
5     A  Yes, I see that.
6     Q  Do you know why whoever filled this out
7  put that on there?
8     A  I have no idea.  But there again, you
9  were wanting to bring up company policy.
10     Q  What do you mean by that?
11     A  I mean just what I said.  You got these
12  papers here and that's company policy that you do just
13  exactly what I had done right here -- turned it in and
14  told him.
15     Q  Did -- as relates to that incident
16  there, did anyone criticize you about the fact that
17  the tooth fell and hit your foot?
18     A  I -- no, sir.  And as far as I know the
19  only thing that was ever said about that right there
20  is what I told that gentleman right there and he wrote
21  down.  He wrote down just exactly what I had told him.
22     Q  Who was it that you told?
23     A  Steve Hicks.
24     Q  All right.  You think Steve Hicks filled

GARRETT REPORTING SERVICE
Post
Charleston,

Ernest Alderman vs. Fola Coal Company LLC, et al.
*Deposition of Joseph Edward Fitzwater*
April 22, 2011

SHEET 41   PAGE 158
158

1 that out?
2      A   I assume that's who it was.  He's the
3 only one I ever talked to about it.  That's the only
4 one I ever knowed that knowed anything about it,
5 really, except for --
6      Q   Did Steve advise you in the future that
7 you needed to --
8      A   Not that I'm aware of, he never.
9      Q   Did he advise you in the future that you
10 needed to change the manner in which you go about
11 changing a tooth on the loader?
12      A   Not that I'm aware of, he never.
13      Q   Did -- did that issue ever come up in
14 safety meetings?
15      A   Not that I'm aware of, it never.
16      Q   Was there every any explanation to you
17 as to the pop -- proper procedure --
18      A   No, sir.
19      Q   -- as to going about filling out --
20 changing a tooth?
21      A   No, sir.
22      Q   All right.
23      A   Sorry I jumped ahead of you.
24          THE WITNESS:  It's number eight.
GARRETT REPORTING SERVICE
Post
Charleston,

PAGE 159
159

1          (WHEREUPON, a document was marked
2          for identification as Deposition
3          Exhibit No. 9, and is attached
4          hereto.)
5 BY MR. LEONORO:
6      Q   The court reporter's handed you
7 Deposition Exhibit 9.  I'll just state for the record
8 this is a "Mine Accident, Injury, Illness and Near
9 Miss Report" dated April 28, 2008.
10      A   Yes, sir.
11      Q   Can you take a minute to look at that?
12 Let me know when you have a chance.
13      A   I -- I don't need to look at it.  I can
14 see it.
15      Q   Do you recognize this document?
16      A   Yeah.
17      Q   Have you seen it before?
18      A   No.
19      Q   All right.  Is it a -- an injury and
20 illness and near miss report that Fola uses?
21      A   It's -- as -- I -- I don't -- this -- I
22 never have seen it before.  This -- again, this is
23 standard policy that if something occurred, you
24 reported it, and it was taken care of.
GARRETT REPORTING SERVICE
Post
Charleston,

PAGE 160
160

1      Q   Is this the standard form right here?
2      A   I have no idea, sir.
3      Q   All right.  And this references a
4 incident that happened on April 28, 2008.  Do you
5 remember this incident?
6      A   I -- not really.
7      Q   You see where it says, "Describe fully
8 the conditions"?
9      A   Just where now?
10      A   Middle of the page.
11      A   Oh, okay, yeah.
12      Q   "Rock came off high wall and broke glass
13 and bottom of door"?
14      A   Yeah.
15      Q   Do you remember that happening?
16      A   I -- no, sir, really, I don't remember
17 this one being broke.
18      Q   You don't remember the glass on the
19 bottom of your --
20      A   I know that they -- I've had them broke,
21 yeah.  I mean I don't remember this certain date or
22 anything, but I do know that I have had glasses broke
23 on the end loaders.
24      Q   Okay.  Is -- is there any reason for you
GARRETT REPORTING SERVICE
Post
Charleston,

PAGE 161
161

1 to dispute that -- that this didn't happen on April
2 28, 2008?
3      A   No, sir, there's no reason for me
4 disputing it.
5      Q   Whose signature's at the bottom of this
6 page?
7      A   (Witness examines document.)  I don't
8 know.
9      Q   Is that maybe Ken Perkins?
10      A   That's --
11      Q   Ken Perkins.
12      A   -- could be.
13      Q   Does that name ring a bell?
14      A   I've heard of Perkins, but that's it.  I
15 don't know.  No, it don't ring really -- I've -- I --
16 I've heard of the name.
17      Q   Did he investigate any incidents that
18 you're --
19      A   Not that I'm aware of.  Again, this is
20 my -- I called and done what the company -- I done the
21 company policy.  I notify them that the glass had
22 broke and how it got broke.
23      Q   Who did you notify on -- on this --
24      A   Now, it's -- I don't know.  I mean it's
GARRETT REPORTING SERVICE
Post
Charleston,

Ernest Alderman vs. Fola Coal Company LLC, et al.
*Deposition of Joseph Edward Fitzwater*
April 22, 2011

SHEET 42   PAGE 162

162

1 probably Dan Cook, or the glass man or the plant --
2 the foreman, whoever.
3      Q   Who's the glass man?
4      A   Summersville Glass.  No, I never
5 notified him.  I mean I notified Dan or somebody that
6 I needed the glass replaced.
7      Q   Dan Cook was your team leader?
8      A   Yeah.
9      Q   Was Steve Hicks your supervisor back at
10 this time?
11      A   I -- no, I do not know.  We had -- like
12 I say, sir, we had so many that I couldn't tell you
13 who was what and --
14      Q   Could it have been Ken Perkins?
15      A   No, sir, I don't think so.  I don't
16 remember him being the -- ever being it.
17      Q   Do you remember what Ken Perkins did at
18 Fola?
19      A   Nope.  I don't --
20      Q   Is he --
21      A   -- I don't know the man.
22      Q   Oh, okay.  So you don't know if he's
23 there or not?
24      A   I don't know.
GARRETT REPORTING SERVICE
Post
Charleston,

PAGE 163

163

1      Q   Do you remember talking in -- at all
2 about this incident with someone?
3      A   I -- the only thing I done was report
4 it, it was broke.
5      Q   Do you remember anyone following up
6 after you reported it?
7      A   No, sir, we -- we never followed up on a
8 broken glass.
9      Q   Okay.  I mean did -- we talked earlier
10 about the truck incident with the -- well, not the
11 truck.  I apologize.
12      A   The loaders?
13      Q   The loaders that collided.
14      A   Okay.  Uh-huh (yes).
15      Q   And there was a follow-up investigation
16 performed by Skeeter and Doug Martin.
17      A   Okay.  That was -- there was two pieces
18 of equipment involved.  That was the proper way to
19 handle it.
20      Q   Was there any type of investigation
21 after this incident here, the April 2008 incident?
22      A   Not that I'm aware of, sir.  I mean we
23 got glasses broke every day.
24      Q   It -- common occurrence there?
GARRETT REPORTING SERVICE
Post
Charleston,

PAGE 164

164

1      A   Very common.
2      Q   What causes the glass to break?
3      A   Well, when you have rocks to hit you.  You
4 can have coal to come off of it and hit you.  There
5 was several, several different ways that you get
6 glasses broken out there working.
7      Q   Are you to take any steps when you're
8 operating the loader to -- to insure that that gla --
9 that rock isn't going to come off and break the glass?
10      A   No.
11      Q   But you're already --
12      A   Can I make one thing clear to you?
13      Q   Sure.  Sure.
14      A   If you was sitting there in that seat
15 right now and that light bulb fell out of that light
16 and hit you, what would you do?
17      Q   If I could get up, I'd probably get up.
18      A   Okay.  When you're working along the
19 high wall in a loader cleaning coal, now a rock or a
20 pebble, something comes off of the wall and bounces
21 and hits you, that's the same thing as that light bulb
22 hitting you.
23      Q   And -- and is that what happened here?
24      A   Yeah.  I mean there's a rock come off of
GARRETT REPORTING SERVICE
Post
Charleston,

PAGE 165

165

1 the wall and hit the loader.  It usually hits the
2 loader and bounces into the window or whatever.  There
3 -- I mean there is no -- I don't know how you'd
4 prevent it.
5      Q   Do you recall any other incidents that
6 you were involved in similar to these three that we
7 just looked at?
8      A   I -- just not right off hand.  I
9 probably had one or two other glasses broke -- windows
10 broke.
11      Q   Because of rock coming off the high
12 wall?
13      A   Rock coming off high wall.  Coal coming
14 off the top of the bucket.  We put bucket extensions
15 on the -- extensions on top of the buckets to keep the
16 coal from going across the top of the bucket and
17 hitting the windshields -- to prevent that from
18 occurring.
19      Q   Okay.  Your allegation in this case is
20 that you've been discriminated against because of your
21 age, correct?
22      A   My age and time.
23      Q   What do you mean by your "time"?
24      A   I had ten -- or nine years and right at
GARRETT REPORTING SERVICE
Post
Charleston,

IN THE SOUTHERN DISTRICT COURT OF WEST VIRGINIA
AT CHARLESTON

ERNEST ALDERMAN,

    Plaintiff,

  v.           CIVIL ACTION NO. 2:10-CV-00907
                 *Lead Case*
               Judge Goodwin

FOLA COAL COMPANT, LLC, a
West Virginia corporation; and
CONSOL ENERGY, INC., a
Delaware corporation,

    Defendants.

# EXHIBIT

# "G"

Ernest Alderman vs. Fola Coal Company LLC, et al.
*Deposition of Joseph Edward Fitzwater*
April 22, 2011

SHEET 1   PAGE 1

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
### At Charleston

**ERNEST ALDERMAN,**

    **Plaintiff,**

v.                          **Civil Action No.:2:10-cv-00907**
                            **Lead Case 1**
                            **Judge Goodwin**


**FOLA COAL COMPANY, LLC, a**
**West Virginia corporation; and**
**CONSOL ENERGY, INC., a**
**Delaware corporation,**

        **Defendants.**

---

## VIDEO DEPOSITION OF JOSEPH EDWARD FITZWATER

---

**APRIL 22, 2011**
**1:30 P.M.**

---

**STEPTOE & JOHNSON, PLLC**
**707 VIRGINIA STREET, EAST**
**CHASE TOWER, 8TH FLOOR**
**CHARLESTON, WEST VIRGINIA**

---

**Nancy S. Jarrell**
**Certified Court Reporter**

*Interview*
*1:30*

DEPOSITION
EXHIBIT
|

**JOSEPH E. FITZWATER**
HC 75, BOX 320
INDORE, WV 25111
(304)587-2168

EDUCATION:
High School Education, Clay County High School
Surface Card No. 123

WORK EXPERIENCE:
- 4 Years Loading Coal $17.20/Hr
Vandalia Resources    09-05-94 to present    - At Big Creek now    *got 20¢ raise 9/1/00
DUTIES:  Coal loader and Dozer operator    09, 10, 11

Appalachian Mining    08-31-1993 to 09-05-1994    "Boomer"
DUTIES:  Dozer operator

Lowlands Coal    08-01-1991 to 04-30-1992    - Kellys Creek
DUTIES:  Loader operator    - HWM pad

Chloe Ridge Coal    05-1990 to 01-1991    Widen - Dick Johnson
DUTIES:  Dozer operator  D9 + 9

Lowlands Coal Co.    8-88 to 3-90    105 HWM (Across From Alloy Plant)
DUTIES:  Loader operator, groundman repair    - IPI property
- Steve Antoline

Battleridge Coal Co.    4-88 to 8-88    2 Y Work  - left for better pay
DUTIES:  Loader operator, Auger operator

Shana Coal Co.    5-86 to 4-88    RT 16 @ Drennin
DUTIES:  Auger operator, Dozer operator
Drove Coal Truck  84-86
Cedar Coal Co.    10-75 to 6-84    D8 + D9
DUTIES:  Auger, Loader, and Dozer operator
- Started

MACHINES OPERATED:
16G and 14G Grader, 988 F and 992 Loader, D10, D11 Dozer

REFERENCES:    Skills
Carl Woody
Clay, WV 25043  (304) 587-4848    1) Coal Loader
- 988 F
Joey Noels    *2) Dozer - D10
Summersville, WV  (304) 872-9294
3) Truck
Dewey Case
Summersville, WV  (304) 872-1268    *preference, less stress
Fole References    Interests
1) *Wayne Kraner   - Good Man    1) steady job
2) Jerry Lewis    2) Close to home
3) John Ortamore
4) Dave Hill

# IN THE SOUTHERN DISTRICT COURT OF WEST VIRGINIA
## AT CHARLESTON

**ERNEST ALDERMAN,**

        **Plaintiff,**

    **v.**                               **CIVIL ACTION NO. 2:10-CV-00907**
                                                   *Lead Case*
                                             **Judge Goodwin**

**FOLA COAL COMPANT, LLC, a**
**West Virginia corporation; and**
**CONSOL ENERGY, INC., a**
**Delaware corporation,**

        **Defendants.**

# EXHIBIT

# "H"

**COPY**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

ERNEST ALDERMAN,
     PLAINTIFF,

VS.                CIVIL ACTION NO:  2:10-CV-00907

FOLA COAL COMPANY, LLC,
A WEST VIRGINIA CORPORATION AND
CONSOL ENERGY, INC., A DELAWARE CORPORATION.
     DEFENDANTS.

DEPOSITION OF

DEAN TAYLOR

JANUARY 26, 2011
9:00 AM

SUMMERSVILLE, WEST VIRGINIA

Denys Renee Snodgrass
Certified Court Reporter
Notary Public

*Plant*

Dean Edward Taylor, Sr.
HC 75 Box 7-A
Lizemore. WV 25125
Home Phone (304) 632-1887

FOLA COAL CO.
APR 2 5 2002

**OBJECTIVE:**          I am applying for a job with your company.
**QUALIFICATIONS**
                        I have over ten years experience working in a preparation plant and strip mine
                        including:  Press operator, plant maintenance, and operation of heavy equipment.

**EDUCATION**
   May 1976            **Clay County High School, 1 Panther Drive, Clay, WV 25043**
                        Diploma

   09/15/1988          **Surface Miners Certification-07**
   03-23-2002          **Annual Safety Refresher Course**

**EMPLOYMENT**
   01-1994 to          *Press Operator/Truck Driver/Heavy Equipment Operator*
   Present             *Piston Coal/Vandalia Resources*
                       *Alloy Prep Plant and  Monoc/Wynoc Prep Plant*
                       *Main Office:  P.O. Box 7500, Lebanon, Virginia 24266*

                       *Press Operator, Plant Maintenance, and Welding and Cutting Torch, Operation of*
                       *off road heavy equipment including:  Triple 7-B, Volvo Truck and Triaxle, D6 and D8*
                       *Dozer, 88 and 92 Loader.*

   05-1990 to          **Truck Driver/Heavy Equipment Operator**
   01-1994             *Pacific Corp:  Nerco/Vandalia Mining Corporartion*
                       *Barbra Lynn Prep Plant  Lizemore, WV*
                       *Main Office:  500 N.E. Multnomah #1100, Portland, Oregon 97232*

                       *Changed employment due to company changing to new company.*
                       *Job duties were same as above except for press operator.*

   06-1989 to          *Truck Driver*
   05-1990             *B&C Repair, Inc.*
                       *P.O. Box 98, Belva, WV 26656*

                       *Changed employment due to Contract Job becoming permanent with company.*
                       *Job Duties:  Operated Mack 1000 Triaxle, Maintenance of Prep Plant.*

   **References**
                       *Gary Trump*        *(304) 779-2073*
                       *Bob Barker*        *(304) 565-3022*
                       *Eddie Harper*      *(304) 587 4777*
                       *Gary VanMeter*     *(304) 632-9833*



DEPOSITION
EXHIBIT
1
PENGAD 800-631-6989

## IN THE SOUTHERN DISTRICT COURT OF WEST VIRGINIA
## AT CHARLESTON

**ERNEST ALDERMAN,**

       **Plaintiff,**

   **v.**

**FOLA COAL COMPANT, LLC, a
West Virginia corporation; and
CONSOL ENERGY, INC., a
Delaware corporation,**

       **Defendants.**

**CIVIL ACTION NO. 2:10-CV-00907**
*Lead Case*
**Judge Goodwin**

# EXHIBIT

# "I"

Ernest Alderman vs. Fola Coal Company LLC, et al.
*Continued Deposition of Glen Jay DeBoard*
April 22, 2011

SHEET 1   PAGE 1

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
### At Charleston

**ERNEST ALDERMAN,**

        **Plaintiff,**

**v.**           **Civil Action No.:2:10-cv-00907**
                            **Lead Case 1**
                            **Judge Goodwin**

**FOLA COAL COMPANY, LLC, a**
**West Virginia corporation; and**
**CONSOL ENERGY, INC., a**
**Delaware corporation,**

        **Defendants.**

---

## CONTINUATION OF THE
## VIDEO DEPOSITION OF GLEN JAY DeBOARD

---

### APRIL 22, 2011
### 9:11 A.M.

---

### STEPTOE & JOHNSON, PLLC
### 707 VIRGINIA STREET EAST
### CHASE TOWER, 8TH FLOOR
### CHARLESTON, WEST VIRGINIA

---

**Nancy S. Jarrell**
**Certified Court Reporter**

**Garrett Reporting Service**
P. O. Box 20200, Charleston, WV 25362
*(304) 346-0460*

FOLA COAL COMPANY, INC.
Application for Employment

Application # _____

Applicant:  Fola Coal Company is an Equal Opportunity Employer and is committed to a policy of non-discrimination in its hiring practices and treatment of employees.  Applicants are not required to give any information on this form that is prohibited by federal, state, or local law. The fact that this form has been furnished to you does not mean there are positions open and does not in any way obligate the company to offer you employment.  All applications will remain on active file for a period of one (1) year from the date of application.

| Name (Last, First, and Middle) | Over 18 | Social Security Number |
|---|---|---|
| DeBoard Glenn Jay | (✓)Yes ( )No | 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 |
| Present Address (Street, City, State, and Zip Code) | | Telephone |
| P.O. Box 70 Indore WV 25111 | | 587-8355 |
| Permanent Address (Street, City, State, and Zip Code) | | Telephone |

| Date Available for Employment | Salary Desired | Employment Desired |
|---|---|---|
| | | (✓)Full Time ( )Temporary |
| List Any Record of Convictions Other Than Minor Traffic Violations: | If Not A U.S. Citizen or Permanent Resident, What Type of Visa Do You Have? | Valid Driver's License (✓)Yes ( )No |
| NONE | | State Issued: WV |

### Educational Record

| Education - Circle Highest Grade Completed | Course of Study Major - Minor | Degree Received | Grade Average Major | Overall |
|---|---|---|---|---|
| 1  2  3  4  5  6  7  8  9  10  11  (12) | | | | |

High School Attended and Location

Clay County High

Vocational or Technical School Attending and Location

College or University and Location

College or University and Location

Other (Include special training, military courses, apprenticeships completed and any other education you believe important)

### Employment Record (Begin with present or most recent employer)

| Employer, Supervisor's Name and Address | From Mo./Yr. | To Mo./Yr. | What Were Your Major Duties and Most Responsible Position Held | Reason For Leaving | Highest Wage |
|---|---|---|---|---|---|
| 1. Appalachian Mining Bob Barker | 3/99 | 1/2003 | Weld/Mechanic Doze operator | Laid off | 17.05 |
| 2. Winoc prep plant Bob Barker | 9/93 | 3/99 | Welder Mechanic Loader operator | went to Alloy | 16.05 |
| 3. Williams Contracting Tom Williams | 5/91 | 9/95 | Truck Driver Dozer operator | went to work at prep plant | 8.00 |
| 4. JD Morris Enterprises JD Morris | 5/89 | 5/91 | Truck Driver | Sold trucks | 6.00 |
| 5. Goulds Electric Jay Gould | 6/82 | 6/89 | A.C. Motor Repair | | 5.05 |



DEPOSITION EXHIBIT
4

PENGAD-Bayonne, N.J.

DEBOARD 00002

| List Any Equipment You Are Qualified To Operate and Any Other Skills You Possess |
|---|
| 777, 785 Rock Trucks   D10 Dozer   988, 992 Loader |
| Welder, Mechanic |
| |
| |

**Military Record**

| Did You Ever Serve in the Armed Forces of the United States   ( ) Yes   (✓) No | If Yes, What Branch |
|---|---|
| Date Entered: | Date Discharged: |

**References**

List below (as references) the names of four persons who know you within the last five years and have knowledge of your qualifications for the position(s) you are applying.

| Name | Address | Telephone Number | Occupation | Years Known |
|---|---|---|---|---|
| 1. Bob Barker | | 585-3022 | Foreman | 10 |
| 2. Reuben Neal | | 587-1958 | Mechanic | 38 |
| 3. Michael Gray | | 587-4243 | Loader oper. | 34 |
| 4. Ed Harper | | 965-7601 | Super. | 8 |

This form will usually provide the necessary information. It may be supplemented, however, by a letter or personal resume. If employment is offered, it will be conditioned upon passing a company prescribed physical examination, including a drug test. The physical examination parameters will be based on the job applied for.

### JOB APPLICANTS AGREEMENT AND CERTIFICATION

I certify that the information given by me in this application is true in all respects, and I agree that if employed and it is found to be false in any way, that I may be subject to dismissal without notice, if and when discovered. I authorize the use of any information in this application to verify my statements, and I authorize past employers, all references and any other persons to answer all questions asked concerning my ability, character, reputation, and previous employment record. I release all such persons from any liability or damages on account of having furnished such information. In consideration of my employment, I agree to conform to the rules and regulations of Fola Coal Company and my employment, I agree to conform to the rules and regulations of Fola Coal Company and my employment and compensation can be terminated, with or without cause, and with or without notice, at any time, at the option of either the company or myself. I understand that no manager or representative of Fola Coal Company has any authority to enter into any agreement for employment for any specified period of time, or to make any agreement contrary to the foregoing.

I agree to submit to a physical examination requested and, if employed, I agree to observe all present and subsequently issued personnel policies and rules. These rules and policies are intended to guide the organization in its relationship with its employees. It is not a contract of employment, and I do not construe it as such. Policies and rules which are issued are not conditions of employment. I understand that the employer may revise policies or procedures, in whole or in part, at any time, with or without notice."

Signature   Glenn DeBoard                    Date _____

DEBOARD 00003